UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Josianne Mell,

        Plaintiff,

v.

The Minnesota State Agricultural Society
d/b/a Minnesota State Fair,

        Defendant.

File No. 21-cv-1040 (ECT/KMM)

**OPINION AND ORDER**

---

Amy E. Boyle and Ross D. Stadheim, Halunen Law, Minneapolis, MN, for Plaintiff
Josianne Mell.

Bryan J. Morben and Erin M. Edgerton Hall, Fredrikson & Byron, P.A., Minneapolis,
MN, for Defendant Minnesota State Agricultural Society.

---

After she had been working at The Minnesota State Agricultural Society—which
does business as the Minnesota State Fair ("the Fair")—for more than 30 years, Josianne
Mell was diagnosed with cancer. Mell underwent surgery at the recommendation of her
doctor and took nearly six months off work to recover. When she returned to work without
restrictions in June 2020, the Fair demoted her and eventually terminated her. Mell claims
that these actions violated several federal and state statutes. The Fair has moved to dismiss
Mell's complaint in its entirety.

The Fair's motion will be granted in part and denied in part. Mell has plausibly
alleged that the Fair violated the Family and Medical Leave Act ("FMLA") when it refused
to restore her to her prior position upon her return from medical leave, and the complaint

does not establish the Fair's asserted defenses.  Mell's FMLA entitlement claim may therefore proceed.  Mell has not plausibly alleged that the Fair discriminated against her for taking FMLA leave, that it took adverse employment actions against her because of her disability, that it failed to reasonably accommodate her disability, or that it retaliated against her for engaging in statutorily protected activity.  Her remaining claims will therefore be dismissed without prejudice.

I[1]

Mell has worked for the Fair in several different roles since 1983, taking on a full-time schedule in 2002.  Compl. ¶ 8 [ECF No. 1].  During the time period relevant to this case, she was a finance supervisor in the Fair's Administration Department.  *Id.*  She received "positive annual performance reviews" and had no documented instances of discipline.  *Id.* ¶ 9.

In late December 2019, Mell was diagnosed with cancer.  *Id.* ¶ 11.  She scheduled a surgical procedure for January 14, 2020, and her doctor told her she would need to take "at least eight weeks off from work for chemotherapy and related recovery."  *Id.*  On December 30, she submitted a leave request to her supervisor at the Fair, Patrick Schoen.  *Id.* ¶¶ 10, 12; Edman Decl., Ex. A at 2 [ECF No. 18-1].[2]  Schoen retroactively approved

---

[1]    In accordance with the standards governing a motion to dismiss under Rule 12(b)(6), the facts are drawn entirely from the Complaint and documents embraced by it.  *See Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014).

[2]    The complaint refers directly to Mell's leave requests and fitness-for-duty certifications, as well as the Fair's responses, and Mell does not contest the authenticity of these documents.  It is therefore appropriate to consider them at the pleading stage.  *See Dittmer Props., L.P. v. F.D.I.C.*, 708 F.3d 1011, 1021 (8th Cir. 2013).  Citations to the

2

the leave request on January 21, after Mell had her surgery.  Compl. ¶ 12; Edman Decl.,

Ex. A at 10.  As of that initial approval, Mell was to return to work on March 10.  Compl.

¶ 12; Edman Decl., Ex. A at 10.

Mell went through with the January 14 surgery and soon discovered "that she

needed more time off to recover."  Compl. ¶ 13.  She requested a four-week extension of

her leave, and the Fair approved that request on March 18.  *Id.* ¶ 14.  The approval letter

informed her that she would "exhaust all 12 weeks of [her] leave entitlement under the

Family and Medical Leave Act on April 8, 2020."  Edman Decl., Ex. B at 19.

This is when miscommunications between Mell and the Fair seem to have begun.

At first, a fitness-for-duty certification from Mell's physician indicated that Mell would

not be able to return to work until June 22, 2020.  Edman Decl., Ex. C; *see* Compl. ¶ 16.

In early April, Mell told another Fair supervisor, Debbie Edman, that her physician had

released her to work without restrictions on April 13, 2020.  Compl. ¶ 15; *see* Edman Decl.,

Ex. D.  Edman said that she was "surprised" by this and "needed to speak with legal

counsel."  Compl. ¶ 15.

Shortly after this conversation, Edman and Schoen called Mell to ask why the doctor

had changed her return-to-work date.  *Id.* ¶ 16.  When Mell replied that she "did not want

to lose her job and health insurance," Schoen told her to change her return date back to

June 22 "because of the COVID-19 pandemic."  *Id.*  Mell did so, requesting additional

documents attached to the Edman Declaration will refer to the pagination in the ECF stamp
at the top of each page.

3

leave through that date.  *Id.* ¶ 17; *see* Edman Decl., Ex. E.  The Fair approved her request effective April 29.  Compl. ¶ 17.[3]

On June 19, Mell submitted an updated fitness-for-duty certification confirming that her doctor had released her to work without restrictions starting June 22.  Compl. ¶ 19; *see* Edman Decl., Ex. F.  According to the job description attached to this certification (which was meant to be used as a reference when determining Mell's work restrictions), Fair employees were expected to take on additional duties due to the "cancellation of the 2020 fair."  Edman Decl. ¶ 7, Ex. F at 35.  These included "[p]hysical activity such as[] maintenance, care and upkeep of plants, flowers, [and] garden areas"; working in an environment with "hazardous substances" and "heat/cold"; and "heavy lifting (up to 50 pounds)."  *Id.*, Ex. F at 35.

Mell attempted to return to her desk job on June 23, 2020.  Compl. ¶ 20.  In a meeting that day, Schoen and Edman informed her that, going forward, she would be "assigned 'special projects' [as] a Floating Laborer," and Schoen would assume "most of her job duties."  *Id.*  The Fair soon cut her hours to part time, forcing her to pay for a portion of her health insurance.  *Id.* ¶ 21.  Over the next few months, Mell performed primarily manual labor, often in the Fair's greenhouse, where temperatures exceeded ninety degrees and sometimes caused her to vomit from the heat.  *Id.* ¶ 22.

---

[3]    The period between the end of Mell's FMLA leave on April 8 and the start of her new leave on April 29 was "covered by the Fair under the COVID-19 'stay at home order' and/or Mell's banked vacation."  Compl. ¶ 17.

4

Finally, on October 6, Schoen and Edman told Mell that she would be terminated, with her last day scheduled for October 30. *Id.* ¶ 23. The Fair offered her a separation agreement which would have required her, among other things, to waive a number of legal claims in exchange for a severance payment. Edman Decl., Ex. G. Mell did not sign the agreement. Compl. ¶ 23.

Mell filed this lawsuit on April 23, 2021, about six months after her termination. ECF No. 1. She asserts the following claims: (1) disability discrimination under the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.08, subd. 2; (2) failure to provide a reasonable accommodation for a disability under the MHRA, Minn. Stat. § 363A.08, subd. 6; (3) reprisal under the MHRA, Minn. Stat. § 363A.15; (4) interference with her right to be restored to her prior position under the FMLA, 29 U.S.C. § 2615; and (5) discrimination under the FMLA. Compl. ¶¶ 24–52. For relief, she seeks a declaratory judgment, injunctive relief, back pay, front pay, compensatory damages, attorneys' fees, and costs. Compl. at 11. The Fair moved to dismiss the Complaint for failure to state a claim upon which relief can be granted. ECF No. 12.

II

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog*, 760 F.3d at 792. Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at

5

570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

At the pleading stage, a plaintiff raising a discrimination or retaliation claim "need not plead facts establishing a prima facie case[.]" *Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 796 (8th Cir. 2021); *see also Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1016 (8th Cir. 2013). "However, the 'elements of the prima facie case are [not] irrelevant to a plausibility determination in a discrimination suit.'" *Warmington*, 998 F.3d at 796 (quoting *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016)). Rather, the allegations in the complaint must "'give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas*,' which in turn 'reduces the facts needed to be *pleaded* under *Iqbal*.'" *Wilson v. Arkansas Dep't of Human Servs.*, 850 F.3d 368, 372 (8th Cir. 2017) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 310, 316 (2d Cir. 2015)). In other words, the elements of the prima facie case are "part of the background against which a plausibility determination should be made." *Blomker*, 831 F.3d at 1056 (citation omitted).

## III

Start with Mell's FMLA claims. "The FMLA entitles eligible employees to twelve weeks of unpaid leave during a twelve-month period for serious medical conditions, and makes it unlawful for employers to interfere with, restrain, or deny employees exercising or attempting to exercise their rights to FMLA leave." *Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 548 (8th Cir. 2021) (internal quotation marks and citation omitted); *see*

6

29 U.S.C. § 2612(a)(1).  Specifically, § 2615(a) of the statute, which provides the basis for

Mell's claims, reads:

> **(a) Interference with rights**
>
> **(1) Exercise of rights**
> It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
>
> **(2) Discrimination**
> It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a).

Our Eighth Circuit Court of Appeals "has recognized three types of claims arising under these two subsections.  The first type, arising under § 2615(a)(1), occurs where an employer refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the Act." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012).  "An employee proceeding on this theory need not show that an employer acted with discriminatory intent." *Id.*  Though in several older cases the Eighth Circuit has described this claim as one for "interference" with FMLA rights, *e.g.*, *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006), it more recently declared that "what we formerly described as 'interference' claims henceforth shall be called 'entitlement' claims." *Bosley v. Cargill Meat Sols. Corp.*, 705 F.3d 777, 780 (8th Cir. 2013) (citing *Pulczinski*, 691 F.3d at 1005).  The second type of claim is one for "retaliation." *Pulczinski*, 691 F.3d at 1005–06.  A retaliation claim arises

7

under § 2615(a)(2) and occurs when an employee opposes any practice made unlawful

under the FMLA. *Id.* The third type of claim

> arises when an employer takes adverse action against an
> employee because the employee exercises rights to which he is
> entitled under the FMLA. In this scenario, the employer does
> not prevent the employee from receiving FMLA benefits.
> Rather, it is alleged that after the employee exercised his
> statutory rights, the employer discriminated against him in the
> terms and conditions of employment. An employee making
> this type of claim must prove that the employer was motivated
> by the employee's exercise of rights under the FMLA. The
> textual basis for such a claim is not well developed in [the
> Eighth Circuit's] cases, but the claim likely arises under the rule
> of § 2615(a)(1) that an employer may not "interfere with,
> restrain, or deny the exercise of or the attempt to exercise"
> rights defined by the FMLA. To distinguish the "entitlement"
> claim under § 2615(a)(1), and the "retaliation" claim under §
> 2615(a)(2), we think it helpful to describe this sort of complaint
> as a "discrimination" claim.

*Pulczinski*, 691 F.3d at 1006 (citations omitted); *see also Massey-Diez v. Univ. of Iowa*

*Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1157 n.5 (8th Cir. 2016) (noting "an unresolved

difference of opinion" in the Eighth Circuit as to whether a discrimination claim arises

under § 2615(a)(1) or (a)(2)). At summary judgment, FMLA discrimination claims are

evaluated "under the *McDonnell Douglas* burden-shifting framework that is applied in

Title VII cases." *Pulczinski*, 691 F.3d at 1007. Mell raises an entitlement claim and a

discrimination claim. Compl. ¶ 46; *see* Pl.'s Mem. in Opp'n at 22–29 [ECF No. 16].

A

First, Mell alleges that she was entitled to be restored to her prior desk job when she

returned from her medical leave. Compl. ¶ 49. The Fair argues that Mell did not have this

right because she was unable to return to work when her FMLA leave expired and because

8

her position was eliminated while she was on leave.  Def.'s Mem. in Supp. at 18–22 [ECF No. 14]; Def.'s Reply Mem. at 13–15 [ECF No. 17].

An employee returning from FMLA leave is generally "entitled to be restored to the same position held prior to the beginning of the leave, or its equivalent, in terms of benefits, pay and other terms and conditions." *Bloom v. Metro Heart Grp. of St. Louis, Inc.*, 440 F.3d 1025, 1029 (8th Cir. 2006) (citing 29 U.S.C. § 2614(a)(1)); *see also* 29 C.F.R. § 825.214.  But this general rule does not entitle the employee to "any right, benefit, or position to which the employee would [not] have been entitled had the employee not taken the leave."  29 U.S.C. § 2614(a)(3); *see also* 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period.").  A Department of Labor Regulation promulgated under the FMLA outlines several situations in which an employee might not be entitled to restoration.  *See* 29 C.F.R. § 825.216.  These include "[i]f an employee is laid off during the course of taking FMLA leave"; "[i]f an employee was hired for a specific term or only to perform work on a discrete project"; and if restoration would cause "substantial and grievous economic injury to the operations of the employer."  *Id.* 825.216(a)–(b).  Most relevant to this case, an employee is not entitled to restoration if, at the end of her FMLA leave, she is "unable to perform an essential function of the position because of a physical or mental condition[.]"  *Id.* § 825.216(c); *see Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 677 (8th Cir. 2001); *St. Hilaire v. Minco Prods., Inc.*, 288 F. Supp. 2d 999, 1008–09 (D. Minn. 2003).

The Fair argues that Mell was not entitled to restoration for two reasons.  First, it says that her position was eliminated due to the COVID-19 pandemic and the cancellation of the 2020 Fair.  Def.'s Mem. in Supp. at 21–22.  But an employer has the "burden of proving that an employee would have been laid off during the FMLA leave period," 29 C.F.R. § 825.216(a)(1), and the Fair cannot meet its burden at this stage.  The Fair states in its brief that Mell's duties were "reduced to a total of 30 to 60 minutes per week because the pandemic forced the [Fair's] cancellation" and "because the pandemic accelerated the Fair's well-known plan to implement finance and sales technology that made many of her duties redundant."  Def.'s Mem. in Supp. at 21.  This statement fills several factual gaps left open in the pleading-stage record.  To be sure, Mell alleges that she "was informed that most of her job duties were being taken over by Schoen."  Compl. ¶ 20.  But this allegation alone does not establish that the pandemic caused the Fair to eliminate Mell's position, or even that the Fair was eliminating the position at all.  It could, for example, mean only that Schoen would handle Mell's duties during a search for her replacement.  Similarly, a document embraced by the complaint states that Fair employees would be expected to take on new assigned duties because the 2020 Fair had been canceled, Edman Decl., Ex. F at 35.  But that document provides no details about the impact of the Fair's cancellation on Mell's position, let alone the Fair's plans to introduce new "finance and sales technology."  The Fair may prevail down the road if it can prove that Mell's position was eliminated, but it would be premature to rule on that defense now.

Second, the Fair argues that Mell was not entitled to be restored to her prior position because she remained unable to perform the job when her leave expired.  Def.'s Mem. in

Supp. at 17–21.  This argument raises a difficult and unsettled legal question: does Mell have the burden to plausibly allege that she was able to perform the job, or does the Fair have the burden to show, based on the pleading-stage record, that she was *un*able to do so?

The relevant statutory and regulatory text does not provide a clear answer to the burden-of-proof question.  The statute simply limits an employee's right of restoration to those "right[s], benefit[s], or position[s] to which the employee would have been entitled had the employee not taken leave."  29 U.S.C. § 2614(a)(3)(B).  Two provisions of the regulation elaborating on this limitation explicitly specify a burden of proof.  "An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration," and "[a]n employer would have the burden of proving that an employee would have been laid off during the FMLA leave period."  29 C.F.R. § 825.216(a); *see Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 978–79 (8th Cir. 2005).  The provision establishing that an employee "unable to perform an essential function of the position" is not entitled to restoration, however, does not appear until two subsections later, and it does not say anything about the burden of proof.  29 C.F.R. § 825.216(c).

Perhaps because of this textual silence, courts have diverged in their approaches.  In two opinions issued weeks apart in 2006, the Eighth Circuit hinted at two opposite conclusions.  In *Battle v. United Parcel Service, Inc.*, the court affirmed a grant of summary judgment based on a district court's conclusion that the plaintiff "failed to establish that he could perform the essential functions of his position[.]"  438 F.3d 856, 864–65 (8th Cir. 2006).  By contrast, in *Bloom v. Metro Heart Group of St. Louis, Inc.*, the court determined

11

that summary judgment was appropriate because the employer had "show[n] a lawful reason . . . for not restoring" the plaintiff to her job—namely, her inability to perform essential functions of the job. 440 F.3d at 1029–30 (quoting *Throneberry*, 403 F.3d at 979). There is reason to believe that neither case definitively resolved the burden-of-proof question. In *Battle*, the evidence showed that the plaintiff "admitted that he could not perform the[] essential functions" at issue, 438 F.3d at 865, and in *Bloom*, the only hard evidence in the record suggested that the plaintiff could not do the job, 440 F.3d at 1030. In other words, the burden of proof did not seem to affect the result in either case.[4]

Beyond the Eighth Circuit, some courts, including at least one in this District, have explicitly placed the burden on the employee to show (or allege) that she was able to do the job. *See, e.g.*, *Womack v. RCM Techs. (USA), Inc.*, No. 07-cv-2111 (DWF/AJB), 2008 WL 5382318, at *5 (D. Minn. Dec. 23, 2008); *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 384 (3d Cir. 2002); *Davidson v. Tyco/Healthcare*, 416 F. Supp. 2d 690, 710 (E.D. Mo. 2005); *Connolly v. Cnty. of Hudson*, No. 09-cv-4509 (SRC), 2011 WL 2489815, at *3–4 (D.N.J. June 21, 2011); *cf. Wanamaker v. Westport Bd. of Educ.*, 899 F. Supp. 2d 193, 205–06 (D. Conn. Sept. 25, 2012) (denying a motion to dismiss in part because plaintiff

---

[4]     In another case, the Eighth Circuit affirmed a jury finding that a plaintiff was "entitled to job restoration" and stated along the way that the FMLA "require[d]" the plaintiff to "demonstrate his ability to perform the essential functions of his former job." *Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 495 (8th Cir. 2002). The case contained no discussion of the burden of proof beyond this quoted statement, and its distinguishable procedural posture suggests the court did not mean to establish a burden of proof. The only question was whether sufficient evidence supported the jury's finding that the plaintiff could perform the essential functions of his position, and the burden does not affect the answer to that question.

"plausibly alleged that she had the ability to return to work at the end of her FMLA leave"). Others, including a different court in this District, have placed the burden on the employer. *See, e.g.*, *Mathews v. Fairview Health Servs.*, No. 01-cv-2151 (ADM/AJB), 2003 WL 1842471, at *6 (D. Minn. Apr. 7, 2003); *Sanders v. City of Newport*, 657 F.3d 772, 780 (9th Cir. 2011); *Portillo v. Munoz Trucking, Inc.*, No. EP-19-CV-00047-MAT, 2019 WL 7761813, at *3 (W.D. Tex. Dec. 20, 2019). Finally, some courts have acknowledged the limitation on an employee's right of restoration without needing to address the burden of proof at all. *See, e.g.*, *Reynolds v. Phillips v. Temro Indus., Inc.*, 195 F.3d 411, 413–15 (8th Cir. 1999).

Several reasonable arguments could favor placing the burden on the employee. First, an employee raising an entitlement claim "has the burden of proving that she was entitled to a benefit under the FMLA" in the first place. *Massey-Diez*, 826 F.3d at 1158. An employee who cannot do the job she seeks arguably should not be able to meet that threshold burden. Second, the fact that earlier provisions of the regulation explicitly place the burden on the employer could suggest that § 825.216(c)'s silence on the issue requires the opposite result. Such a distinction could make practical sense. An employer is the party most likely to possess facts bearing on the question whether the employee "would []] otherwise have been employed" or whether the employee's position had been eliminated. 29 C.F.R. § 825.816(a). By contrast, an employee may be in the best position to know whether she is "unable to perform an essential function of the position." *Id.* § 825.216(c).

Notwithstanding these considerations, the better answer is that § 825.216(c) lays out an affirmative defense that an employer must plead and prove. This conclusion is more

13

consistent with the structure of the statute and regulations. As a general matter, the FMLA gives an employee the right to be restored to her position after returning from leave. *See* 29 U.S.C. § 2614(a)(1)(B); 29 C.F.R. § 825.214. The statute and regulations could have incorporated the employee's ability to work into that general statement of the right: *i.e.*, that an employee who is able to perform the essential functions of her old job has a right to be restored to that job. But instead of taking that approach, the regulation creates an exception to the general rule when the employee is "unable" to perform. Based on this structure, the most reasonable reading of the regulation is that an employee's inability to do the job is just one of many reasons that the "employee would not otherwise have been employed at the time reinstatement is requested[.]" 29 C.F.R. § 825.216(a). And an employer has the burden to prove that an employee "would have been dismissed regardless of the employee's request for, or taking of, FMLA leave." *Throneberry*, 403 F.3d at 979 (quoting *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 963 (10th Cir. 2002)). Moreover, while an employee may be in the best position to know her own physical limitations, the employer determines what "function[s] of the position" are "essential." 29 C.F.R. § 825.216(c). The bottom line is that, as long as Mell has plausibly alleged she was denied restoration to her prior job upon her return from leave, she can pursue her claim unless the pleading-stage record establishes that she was unable to perform an essential function of the job. *See United States v. Xcel Energy, Inc.*, 759 F. Supp. 2d 1106, 1118 (D. Minn. 2010).

The pleading-stage record shows that Mell's leave began on January 14, 2020. Compl. ¶ 12; *see* Edman Decl., Ex. A at 10; Pl.'s Mem. in Opp'n at 23. This means the

last day of her twelve-week continuous leave was April 7, 2020, and, as alleged in the complaint and confirmed in the Fair's letter to Mell, "[h]er FMLA leave was exhausted as of April 8, 2020." Compl. ¶ 14; *see* Edman Decl., Ex. B at 19.[5] Originally, Mell's doctor planned to release her to "unrestricted" work on June 22. Edman Decl., Ex. C. When Mell began to worry that she would lose her job, her doctor moved the release date up to April 13—five days after the expiration of Mell's FMLA leave. *See* Compl. ¶ 15; Edman Decl., Ex. D at 30. In other words, Mell's doctor released her to "unrestricted" work, at the earliest, on April 13.[6] Beyond these return-to-work certifications, however, the record as it stands now shows nothing about Mell's physical condition or ability to perform her prior job on April 8.

Although it is a close call, it would be premature to decide that Mell was "unable to perform an essential function of [her] position because of a physical or mental condition" on April 8. 29 C.F.R. § 825.816(c). Whether a function of the job is "essential" and

---

[5]     **Mell argues** that the expiration date of her FMLA leave "remains an open question" and may have been as late as April 14, 2020, not April 8. Pl.'s Mem. in Opp'n at 23. She provides no authority for this calculation, and as the Fair points out in its reply brief, twelve weeks from January 14 is April 7, not April 14. Def.'s Reply Mem. at 2 n.1.

[6]     Mell points out that the Fair directed her to change her return-to-work date from April 13 back to June 22 "because of the COVID-19 pandemic," Compl. ¶ 16, and appears to argue that the Fair should be estopped from denying her right to restoration. Pl.'s Mem. in Opp'n at 23 n.15 (citing *Duty*, 293 F.3d at 493–94). This argument is tangential to the material question: whether Mell was "unable to perform an essential function of [her] position" on April 8. 29 C.F.R. § 825.216(c). Moreover, in *Duty*, the employer sent the plaintiff a "letter informing him that his entire 34-week sick leave qualified under the FMLA." 293 F.3d at 493. Here, by contrast, the Fair informed Mell that her leave would be exhausted by April 8, and the complaint itself says that at least some of her post-April-8 leave was covered "under the COVID-19 'stay at home order' and/or Mell's banked vacation," not the FMLA. Compl. ¶¶ 14, 17.

whether an employee can perform it are both heavily fact-dependent questions. *See* 29 C.F.R. § 825.123(a) (incorporating by reference 29 C.F.R. § 1630.2(n)); *Leathers v. GlaxoSmithKline, LLC*, No. 2:19-cv-04939-JMG, 2021 WL 1837436, at *4 n.4 (E.D. Pa. May 7, 2021). The record, along with inferences in Mell's favor, shows that she could work without restrictions by April 13, but it does not show whether she could have worked with restrictions (and still performed the essential functions of the job) earlier. The five-day gap between the end of Mell's leave and her potential return-to-work date raises other questions. As Mell points out in her response brief, April 8 was a Wednesday; April 10 was Good Friday, and April 13 was the Monday after Easter. *See* Pl.'s Mem. in Opp'n at 23 n.16. In light of that holiday, it seems plausible that Mell's doctor specified the April 13 return date as a matter of convenience, not Mell's physical condition (though, of course, the record does not reveal the doctor's thinking). In short, the record strongly suggests that Mell was unable to do the job on April 8, and if that proves true, then her entitlement claim will fail. But at this stage, there are too many factual gaps to responsibly conclude that she had no right to reinstatement.

B

Turning to the FMLA discrimination claim, Mell alleges that the Fair demoted her and eventually terminated her because she exercised her FMLA rights. Compl. ¶¶ 20, 49; Pl.'s Mem. in Opp'n at 25–29. The Fair argues that Mell has not plausibly alleged that her exercise of FMLA rights caused these adverse actions. Def.'s Mem. in Supp. at 22–23.

To proceed with a discrimination claim, Mell must plausibly allege that the Fair took an adverse employment action against her because she exercised her FMLA rights.

16

*See Brown v. City of Jacksonville*, 711 F.3d 883, 891 (8th Cir. 2013). Mell does not suggest that this case involves any direct evidence of discrimination. Absent such allegations, she will eventually need to establish the elements of a prima facie case: "(1) that [s]he engaged in activity protected under the Act, (2) that [s]he suffered a materially adverse employment action, and (3) that a causal connection existed between [her] action and the adverse employment action." *Brown v. Diversified Distrib. Sys., LLC*, 801 F.3d 901, 908 (8th Cir. 2015) (citation omitted); *see Pulczinski*, 691 F.3d at 1007.

The Fair does not dispute that the complaint plausibly supports the first two elements of the prima facie case. By requesting and taking leave for her surgery and ensuing recovery, Mell engaged in protected activity. *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002). And although the Fair's arguments focus on Mell's termination, Mell has alleged several plausible adverse employment actions. "An adverse employment action requires a significant change in an employee's status, such as termination, demotion, or reassignment with significantly different job responsibilities." *Quinn v. St. Louis Cnty.*, No. 09-cv-1372 (ADM/LIB), 2010 WL 3733970, at *5 (D. Minn. Sept. 20, 2010). On her first day back at work in June 2020, Schoen informed Mell that she would be reassigned from her office job to "special projects" as a "Floating Laborer," that she "would likely be out of a job soon," and that she should "refrain from asking other managers and employees for work and other opportunities." Compl. ¶ 20. Shortly thereafter, the Fair cut Mell's hours from full time to part time. *Id.* ¶ 21. Finally, at the end of October, Mell was terminated. *Id.* ¶ 23. All of these plausibly involve a significant negative change in Mell's employment status.

17

The Parties dispute whether Mell has alleged a causal connection between her use of FMLA leave and any of these adverse actions.  To do so, her allegations must make it plausible that her "exercise of FMLA rights played a part in the [Fair's] decision." *Pulczinski*, 691 F.3d at 1007 (internal quotation marks and citations omitted).  "Generally, more than a temporal connection between the protected conduct and the adverse employment action is required[.]" *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc).  Temporal proximity alone may suffice only if it is "very close." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006) (citation omitted).  In determining the temporal relationship between the two events, the Eighth Circuit "looks to the date an employer knew of an employee's use (or planned use) of FMLA leave, not the date it ended." *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012) (citation omitted). The Eighth Circuit has said that, "without something more," a gap of more than two months between the date the employer knew of the employee's planned use of FMLA leave and the adverse action "is too long" to show a causal connection between the two. *Id.* at 901.

Mell has not plausibly alleged causation.  The Fair knew of Mell's plan to take FMLA leave on December 30, 2019.  Compl. ¶ 12.  Nearly six months passed before the Fair allegedly demoted her when she tried to return to work. *Id.* ¶ 20. *See, e.g.*, *Sisk*, 669 F.3d at 900 (affirming grant of summary judgment in case involving gap of "more than two months"); *Olinger v. Renville Cnty. Hosp. & Clinics*, 423 F. Supp. 3d 680, 691 (D. Minn. 2019) (granting summary judgment in case involving gap of "more than six months"). There are no allegations that the Fair gave Mell any trouble about taking FMLA leave in the meantime.  It did not, for example, express any reticence or frustration about granting

18

her request for a leave extension in March or otherwise suggest that it was disappointed that she had taken leave. *See Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711, 720–21 (1st Cir. 2014). On the contrary, after Mell's FMLA leave entitlement expired and she tried to return to work in April, the Fair told her to change her return-to-work date back to June 22, which resulted in more than two months of additional leave. Compl. ¶ 16. Moreover, the job description attached to Mell's final fitness-for-duty report says that "all employees" would be expected to take on the type of manual-labor tasks that Mell was required to perform. Edman Decl., Ex. F at 35. This makes it less plausible that her reassignment to those tasks had anything to do with her FMLA leave. Under these circumstances, Mell has not sufficiently alleged that her exercise of FMLA rights "played a part" in any of the adverse employment actions taken against her. *See Lebowitz v. N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d 158, 179 (E.D.N.Y. 2017); *Ryan v. Pace Suburban Bus Div. of Reg'l Transp. Auth.*, 837 F. Supp. 2d 834, 837 (N.D. Ill. 2011).

Mell's arguments in response do not affect this conclusion. First, she emphasizes that the first adverse employment action—her reassignment to labor tasks—occurred immediately when she returned to work. Pl.'s Mem. in Opp'n at 28. But her return-to-work date is not the relevant benchmark. What matters is when the Fair "knew of [Mell's] use (or planned use) of FMLA leave[.]" *Sisk*, 669 F.3d at 900.

Second, Mell cites the Eighth Circuit's statement that a "pattern of adverse actions that occur just after protected activity can supply the extra quantum of evidence to satisfy the causation requirement." *Smith*, 302 F.3d at 832. The problem with this argument is the same one that undermines Mell's temporal-proximity argument more generally. Mell

may have alleged a "pattern of adverse actions," but none of them occurred until nearly six months after the Fair learned that Mell would take FMLA leave. It is not fair to say that any of the actions occurred "just after protected activity."

Finally, Mell argues she "must be allowed to pursue discovery because it will likely reveal more evidence of causation beyond timing alone[.]" Pl.'s Mem. in Opp'n at 28. Because she has not alleged a plausible claim, however, Mell has not shown a "reasonable expectation that discovery will reveal evidence" to support her FMLA claims. *Mitchell v. Fed. Cartridge Co.*, No. 17-cv-610 (PAM/HB), 2017 WL 2345679, at *1 (D. Minn. May 30, 2017) (quoting *Twombly*, 550 U.S. at 556). Her FMLA discrimination claim will accordingly be dismissed.

IV

A

Now move to Mell's state-law claims, beginning with her claim that the Fair discriminated against her based on her disability in violation of the MHRA. *See* Minn. Stat. § 363A.08, subd. 2; Compl. ¶¶ 24–30. To prevail on this claim, Mell would eventually have to prove that (1) she has a "disability" as the MHRA defines that term; (2) she was "qualified to perform the essential functions of h[er] job, with or without reasonable accommodation," and (3) she "suffered an adverse employment action because of h[er] disability." *Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1183 (8th Cir. 2019). The Fair argues that Mell has failed to plausibly allege that she had a disability or that her disability "actually motivated" any of the adverse actions against her. Def.'s

Mem. in Supp. at 12 (quoting *Lewis v. CNA Nat'l Warranty Corp.*, 63 F. Supp. 3d 959, 961 (D. Minn. 2014)).[7]

1

The MHRA defines a "disability" as a "condition or characteristic that renders a person a disabled person." Minn. Stat. § 363A.03, subd. 12. A "disabled person," in turn, is one who "(1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." *Id.* Mell argues that she has plausibly alleged a disability under all three prongs. *See* Pl.'s Mem. in Opp'n at 13–19.

Mell has not plausibly alleged that she had an impairment that materially limited her life activities at the time the Fair took any adverse employment actions against her. The term "'impairment' includes ongoing conditions, but does not include transient conditions in the past that no longer impair the person." *Clemons v. MRCI WorkSource*, No. A13-1994, 2014 WL 2178938, at *5 (Minn. Ct. App. May 27, 2014) (collecting cases). "The degree to which a condition limits one or more major life activities is evaluated based on the plaintiff's specific circumstances." *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 543 (Minn. 2001). The earliest potential adverse action that Mell alleges occurred on June 23, 2020, when she returned to work and was told that Schoen was taking over her duties and that she would be reassigned to manual-labor tasks. Compl. ¶ 20. At

---

[7]     The Fair also argues that Mell's disability-discrimination claim fails because she has not alleged that she was replaced by a non-disabled employee. Because the claim will be dismissed for other reasons, it is not necessary to address this argument.

that point, Mell had been released to work without restrictions. *See* Edman Decl., Ex. F at 34. Her chemotherapy had ended about a month earlier. Compl. ¶ 18. Mell does not allege that any ongoing effects of her cancer materially limited her ability to work or engage in any other life activities. *See Liljedahl v. Ryder Student Transp. Servs., Inc.*, 341 F.3d 836, 841 (8th Cir. 2003) (holding that summary-judgment record did not support a finding that plaintiff's cancer materially limited a major life activity because plaintiff's "cancer surgery was successful and her recuperation period was limited").

To support the opposite conclusion, Mell relies extensively on precedent and administrative guidance interpreting the federal Americans with Disabilities Act to argue that cancer in remission qualifies as an ongoing disability under the MHRA. *See* Pl.'s Mem. in Opp'n at 15–16. It is true that courts frequently treat the ADA and MHRA as interchangeable because their definitions overlap in many respects.[8] *See, e.g.*, *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). But "[w]hen provisions of the [MHRA] are not similar" to provisions of the ADA, Minnesota courts "have departed from the federal rule[s] in [their] interpretation of the" state statute. *McBee v. Team Indus., Inc.*, 925 N.W.2d 222, 228 (Minn. 2019). Here, there is a crucial difference between the two. Under a 2008 amendment to the ADA, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C.

---

[8] One notable difference is that the MHRA defines a disability as an impairment that "materially" limits life activities, Minn. Stat. § 363A.03, subd. 12, while the ADA defines it as an impairment that "substantially" limits life activities, 42 U.S.C. § 12102(1)(A). Courts have described the MHRA standard as "less stringent." *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 n 4 (8th Cir. 2016).

§ 12102(4)(D).  Administrative guidance interpreting the ADA says that "an individual who has cancer that is currently in remission is an individual with a disability under the 'actual disability' prong because [s]he has an impairment that would substantially limit normal cell growth when active."  29 C.F.R. Appendix to Part 1630, Interpretive Guidance on Title I of the ADA, 29 C.F.R. § 1630.2(k); *see Oehmke*, 844 F.3d at 756.  The MHRA contains no similar provisions, and Mell has not raised an ADA claim.

Mell also has not plausibly alleged that the Fair "regarded" her as having an impairment that materially limited a major life activity.  Minn. Stat. § 363A.03, subd. 12(3).  To do so, she would have to allege facts plausibly showing that the Fair "believed" that she suffered such limitations and that her impairment was "permanent or long term." *McLain v. Andersen Corp.*, 567 F.3d 956, 968 (8th Cir. 2009) (citations omitted).  Her allegations do not meet this standard.  Again, by the time Mell returned to work in June 2020, the Fair had been told that she could work without restrictions.  Compl. ¶¶ 19–20.  A month earlier, she had emailed the Fair to let them know she was "looking forward to" her return and that things would "be back to normal."  *Id.* ¶ 18.  She does not allege that she experienced any cancer-related limitations after her return to work or that the Fair believed she did.

Nonetheless, Mell has plausibly alleged that she had a "record of" an impairment that materially limited one or more major life activities.  Minn. Stat. § 363A.03, subd. 12(2).  "To have a record of an impairment" under the MHRA, "an employee must have a history of" a qualifying impairment.  *Heisler v. Metro. Council*, 339 F.3d 622, 630 (8th Cir. 2003) (cleaned up); *see Leitner v. Gartner Studios, Inc.*, No. A07-63, 2008 WL

23

314177, at *4 (Minn. Ct. App. Feb. 5, 2008). In contrast to the other two prongs of the definition of "disability," the employee may have a record of an impairment even if she is not currently experiencing the effects of the impairment. *See Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 281 (1987) (addressing the phrase "record of" as used in the ADA). On the other hand, "[s]imply having a medical condition and taking time off work to receive treatment for the condition does not establish a record of disability," *Rohland v. St. Cloud Christian Sch.*, No. A04-821, 2004 WL 2940889, at *8 (Minn. Ct. App. Dec. 21, 2004). Mell alleges that after her cancer diagnosis, her doctor advised her to undergo surgery and told her "that she would need at least eight weeks off from work" for the recovery. Compl. ¶ 11. Although, as discussed above, there are open questions about when Mell was physically able to return to work, she ultimately did not return until more than five months after her surgery. *See id.* ¶ 20. In the meantime, she underwent chemotherapy. *Id.* ¶ 18. The Fair was well aware of this medical history. These allegations make it plausible that, at some point, Mell's cancer materially limited one or more of her major life activities and that she therefore has a "record of" a qualifying impairment. *See Cornman v. N.P. Dodge Mgmt. Co.*, 43 F. Supp. 2d 1066, 1071–73 (D. Minn. 1999).

The Fair argues that the Eighth Circuit held in *Liljedahl* that cancer can never be a disability under the MHRA if a plaintiff undergoes surgery and recovers. There are at least two reasons not to read the case as establishing such a broad principle. First, the court decided the case on a summary-judgment record that did not "support a finding [that] Liljedahl's cancer materially limited a major life activity[.]" 341 F.3d at 841. The court noted that Liljedahl's "surgery was successful" and her "recuperation period was limited."

*Id.* Liljedahl was only on leave for three months—less time than Mell—and the opinion mentions nothing about her undergoing chemotherapy.[9] *See id.* at 838. Second, by the time of the appeal, Liljedahl's primary argument was that she was materially limited by "emphysema [and] breathing problems" that had been exacerbated by her cancer surgery, not the cancer itself. *Id.* at 841. And she never argued that her cancer surgery and recovery gave her a "record of" an impairment that materially limited her major life activities. *See* Br. of Appellant, *Liljedahl v. Ryder Student Transp. Servs., Inc.*, No. 02-3804 (8th Cir. Jan. 6, 2003), 2003 WL 23622391, at **28–33. Remaining mindful of the applicable pleading standards and the principle that a plaintiff's limitations must be "based on the plaintiff's specific circumstances," *Hoover*, 632 N.W.2d at 543, the better answer is that Mell has sufficiently alleged a disability.

2

Mell must also plausibly allege that the Fair took adverse employment actions against her "because of" her disability. Minn. Stat. § 363A.08, subd. 2. To do so, she must identify facts plausibly showing that her disability "actually played a role" in the decision to take adverse actions against her. *Lewis*, 63 F. Supp. 3d at 961–62 (quoting *Goins v. West Grp.*, 635 N.W.2d 717, 722 (Minn. 2001)); *see Norton v. ISD 197*, No. 20-cv-1530 (DWF/TNL), 2021 WL 2002314, at *4 (D. Minn. May 19, 2021). There must have been

---

[9]     Indeed, according to the district court in the case, "[t]o the extent that Liljedahl contend[ed] her disability [was] cancer, she offer[ed] no evidence other than the fact of her cancer and surgery." *Liljedahl v. Ryder Student Transp., Inc.*, No. 01-cv-1841 (JRT/FLN), 2002 WL 31185898, at *3 (D. Minn. Sept. 30, 2002), *aff'd*, 341 F.3d 836 (8th Cir. 2003).

a "specific link between the discrimination and the adverse action[.]"  *Chalfant v. Titan Distrib., Inc.*, 475 F.3d 982, 990–91 (8th Cir. 2007) (addressing an ADA claim); *see also Brunckhorst*, 914 F.3d at 1183 (applying the same causation standard to claims under the ADA and MHRA).

Mell emphasizes three allegations in the complaint.  First, when she attempted to move her start date up from June 22 to April 13, Edman stated that she was "surprised" and "needed to speak with legal counsel."  Compl. ¶ 15.  Second, the Fair directed her to stay on leave rather than returning to work in April.  *Id.* ¶ 16.  And third, once Mell did return to work in June, the chain of adverse employment actions began "immediate[ly]."  Pl.'s Mem. in Opp'n at 19–20 & n.12; *see* Compl. ¶ 20.

These allegations, even considered together, do not plausibly show that any adverse employment actions were motivated by Mell's cancer.  It is true that the first alleged adverse action occurred immediately when Mell returned to work.  But, as with Mell's FMLA discrimination claim, the temporal-proximity clock began to run when the Fair learned of her cancer, not when she returned to work.  *See E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 969–70 (8th Cir. 2014); *Norton*, 2021 WL 2002314, at *4 n.16.  The Fair knew about her diagnosis in December, nearly six months before it demoted her.  Compl. ¶ 12; *see also Norton*, 2021 WL 2002314, at *4 n.16 (three-month gap between notifying employer of disability and employee's termination did not plausibly show causation).  Edman's statement that she was "surprised" by Mell's attempt to return to work early and "needed to speak with legal counsel" do not suggest discriminatory animus related to Mell's cancer, especially considered alongside the fact that, at the time, the Fair

continued to employ Mell despite the extension of her leave beyond the mandatory FMLA period. *See Coleman v. Minneapolis Pub. Schs.*, No. 18-cv-2283 (DSD/ECW), 2021 WL 2289739, at *7 (D. Minn. Apr. 22, 2021) (reasoning that employer's "agree[ment] to accommodate" plaintiff's disability before it later took adverse actions detracted from causation); *see also Prod. Fabricators*, 763 F.3d at 970; *Winfrey v. Ford Motor Co.*, No. 4:19-CV-00889-DGK, 2020 WL 1558117, at *3 (W.D. Mo. Apr. 1, 2020) (fact that employee was on medical leave for disability at the time of adverse action did not plausibly show causation); *Wilmes v. Packsize, LLC*, No. 4:19-CV-02749 SEP, 2020 WL 1929853, at *4 (E.D. Mo. Apr. 21, 2020) (fact that plaintiff was "repeatedly questioned about her medical condition" did not plausibly show causation). Finally, the Fair's directive to Mell to remain on leave does not make a legal difference. The Fair told Mell that she should stay off work "because of the COVID-19 pandemic," Compl. ¶ 16, and no allegations suggest this statement was false or pretextual. In short, the complaint does not plausibly show a "specific link" between Mell's cancer and any of the adverse actions against her. *Chalfant*, 475 F.3d at 990–91. Her disability-discrimination claim will therefore be dismissed.

## B

Next, Mell asserts that the Fair violated the MHRA by failing to provide a reasonable accommodation for her disability. *See* Minn. Stat. § 363A.08, subd. 6. In her view, the Fair was required to accommodate her disability by "return[ing] her to her previous finance job or another similar/equivalent position." Pl.'s Mem. in Opp'n at 30. The Fair argues that it had no legal duty to restore Mell to her position because the FMLA

did not require it to; that Mell never asked to return to her prior position; and that Mell's position was eliminated while she was on leave. Def.'s Mem. in Supp. at 13–15.

Many of the Fair's arguments are unpersuasive. The Fair does not cite authority supporting a categorical rule that restoration to an employee's prior position is not a reasonable accommodation under the MHRA simply because it is not required under the FMLA. *Cf. Brunckhorst*, 914 F.3d at 1182 (holding that a plaintiff had not shown that a return to his original position was a reasonable accommodation because there was "no medical reason" why it was necessary). It is also incorrect to say that Mell never asked for her old job. She alleges that, while she was on leave, she "kept both Schoen and Edman updated on her treatment progress *and her intent to return to her position, fulltime*." Compl. ¶ 18 (emphasis added). It is therefore plausible that she made clear her desire for the prior position. Finally, the Fair renews its argument that it would not have been "reasonable" to restore Mell to the prior position because that position had been eliminated. S*ee* Minn. Stat. § 363A.08, subd. 6(a) (stating that a failure to provide an accommodation is not unlawful if the employer "can demonstrate that the accommodation would impose an undue hardship on the business, agency, or organization"). As discussed above in connection with Mell's FMLA entitlement claim, this argument depends on facts outside the pleadings.

Nonetheless, Mell has not plausibly alleged a reasonable-accommodation claim. A "[r]easonable accommodation" is a "step[] which must be taken to accommodate the known physical or mental limitation of a qualified individual with a disability." *Id.* In other words, the employee must need the accommodation because of her disability, not for

some other reason. *See Brunckhorst*, 914 F.3d at 1182. As of the time Mell returned to work in late June 2020, her doctor had released her to work without restrictions. Compl. ¶ 19; *see* Edman Decl., Ex. F at 34. In making that determination, Mell's doctor had available a job description that encompassed the manual-labor tasks to which Mell was later assigned. *See* Edman Decl. ¶ 7, Ex. F at 35. Mell does not allege that she experienced any ongoing effects from her cancer after she returned to work or that those effects required her to maintain a desk job. Her reasonable-accommodation claim will therefore be dismissed.

C

Finally, Mell claims that the Fair violated the MHRA's prohibition on unlawful reprisal. *See* Minn. Stat. § 363A.15 (making it unlawful for an employer to "engage in any reprisal against any person because that person . . . opposed a practice forbidden under this chapter or . . . participated in any manner in an investigation, proceeding, or hearing under this chapter"). On this claim, Mell would eventually need to show that (1) she engaged in protected conduct, (2) she suffered an adverse employment action, and (2) there was a causal connection between the two. *See Finch v. Abbott Nw. Hosp.*, No. A20-0494, 2021 WL 162383, at *8 (Minn. Ct. App. Jan. 19, 2021) (quoting *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 444 (Minn. 1983)). According to Mell, she engaged in protected conduct when she requested FMLA leave and when she asked for her former position as a reasonable accommodation for her disability. Pl.'s Mem. in Opp'n at 34–35. The Fair argues that Mell has not plausibly alleged a causal connection between any protected conduct and the adverse actions taken against her. Def.'s Mem. in Supp. at 16–17.

29

The Fair has the better argument.  To the extent Mell relies on her request for FMLA leave as protected activity, this claim fails for the same reason as her FMLA discrimination claim.  The Fair learned of Mell's request for FMLA leave in December 2019, and nearly six months passed before it took any adverse actions against her.  Absent other allegations supporting an inference of causation, this temporal gap is too large.

As for Mell's request for a reasonable accommodation in the form of restoration to her prior position, there are two problems.  First, it is not clear exactly when Mell made this request, but the complaint says that she made her intent to return to the job clear "[t]hroughout the entire course of her leave and related recovery[.]"  Compl. ¶ 18.  The only reasonable inference to draw from this allegation is that the Fair was aware of Mell's desire to return to her job by at least January or February of 2020.  But again, months passed before the Fair took any adverse actions against her, and no allegations beyond that temporal connection support an inference of causation.  Second, when an employee does not "specifically tie her request[]" for an accommodation to her disability, the employee has not engaged in protected activity under the MHRA.  *Hoover v. Norwest Private Mortg. Bank*, Nos. A03-1347, A03-1796, 2004 WL 1328057, at *9 (Minn. Ct. App. June 9, 2004) (citing *Hoover*, 632 N.W.2d at 548)).  As discussed above, no allegations plausibly show that limitations related to Mell's cancer required her to be restored to her old job, much less that she communicated such a connection to the Fair.  Mell's reprisal claim will therefore be dismissed.

V

At the conclusion of her brief, Mell asks for an opportunity to file an amended complaint to "cure any identified shortcomings." Pl.'s Mem. in Opp'n at 36. Rule 15(a) encourages courts to grant leave to amend "when justice so requires," and the Eighth Circuit has said that "parties should usually be given at least one chance to amend their complaint," *Wisdom v. First Midwest Bank*, 167 F.3d 402, 409 (8th Cir. 1999). At the same time, however, parties should generally "not be allowed to amend their complaint without showing how the complaint could be amended to save the meritless claim." *Id.*

"[C]ourts ultimately have discretion to decide between a with-prejudice and without-prejudice dismissal." *Miles v. Simmons Univ.*, 541 F. Supp. 3d 1070, 1080 (D. Minn. 2021). Dismissal with prejudice is often appropriate when a plaintiff has shown "persistent pleading failures despite one or more opportunities to amend. *See Milliman v. Cnty. of Stearns*, No. 13-cv-136 (DWF/LIB), 2013 WL 5426049, at *16 (D. Minn. Sept. 26, 2013). On the other hand, when a plaintiff's claims "might conceivably be repleaded with success," particularly where discovery might reveal yet-unknown facts relevant to a dismissed claim, dismissal without prejudice may be justified. *Washington v. Craane*, No. 18-cv-1464 (DWF/TNL), 2019 WL 2147062, at *5 (D. Minn. Apr. 18, 2019), *report and recommendation adopted*, 2019 WL 2142499 (D. Minn. May 16, 2019).

Mell will not be granted leave to amend her complaint at this time. She had a right to amend her complaint without leave after reviewing the arguments the Fair raised in its motion, *see* Fed. R. Civ. P. 15(a)(1)(B), but she chose to stand by the complaint in its

31

present form. She has not shown what changes she would make that would fix the problems the Fair identifies.

Nonetheless, to the extent Mell's claims are dismissed, they will be dismissed without prejudice. The primary flaw in these claims is a lack of factual allegations, not any insuperable legal bar to relief. It is conceivable that discovery may reveal information that Mell could not have obtained before and that supports the dismissed claims (just as it may reveal information negating the FMLA claim that survives). If it does, Mell will be able to seek leave to amend in accordance with applicable procedural rules.

### ORDER

Based on the foregoing, and on all the files, records, and proceedings in this case,

**IT IS ORDERED THAT** Defendant Minnesota State Agricultural Society's Motion to Dismiss [ECF No. 12] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.   The motion is **DENIED** as to Count IV insofar as that count alleges an entitlement claim under the Family and Medical Leave Act;

2.   The motion is **GRANTED** as to Count IV insofar as that count alleges a discrimination claim under the Family and Medical Leave Act. The FMLA discrimination claim is **DISMISSED WITHOUT PREJUDICE**; and

3.   The motion is **GRANTED** as to Counts I, II, and III, and those counts are **DISMISSED WITHOUT PREJUDICE**.

Dated:  August 30, 2021                        s/ Eric C. Tostrud
                                               Eric C. Tostrud
                                               United States District Court